RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT
CLERK
US DISTRICT & BANKRUPTCY
COURTS FOR DC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

2020 OCT -9  A 10: 59

FILING DEPOSITORY
RECEIVED

| | |
|---|---|
| UNITED STATES OF AMERICA *ex. rel.*<br>THOMAS MAHONEY<br>12 Whitehorse Drive Rye, New Hampshire 03870<br><br>Plaintiff and Relator,<br><br>v.<br><br>JABIL INC.<br>10560 MLK Street North Saint Petersburg, FL 33716<br><br>Defendant. | **UNDER SEAL**<br><br>Case: 1:20-cv-02929 JURY DEMAND<br>Assigned To : Kollar-Kotelly, Colleen<br>Assign. Date : 10/9/2020<br>Description: Gen. Civil (E-DECK) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex. rel.* THOMAS MAHONEY | ) ) ) | |
| Plaintiff and Relator, | ) ) | |
| v. | ) ) | **UNDER SEAL** |
| JABIL INC., | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I.  INTRODUCTION

1. Relator Thomas Mahoney ("Relator" or "Mahoney") brings this action on behalf of the United States against Jabil Inc. ("Jabil" or "Defendant"), to recover damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2. Jabil is a large global provider of manufacturing and design services, including in the information technology industry. Jabil earns billions in revenue each year and has been dubbed "the manufacturing giant you've never heard of."[1] Jabil depends for this revenue upon the large amount of business it earns from a relatively small number of core customers, one of the largest of which is Cisco Systems, Inc. ("Cisco"). Cisco perennially ranks as one of the United States' largest federal contractors by revenue earned from purchase by federal agencies.

3. For at least the past five years, Jabil has regularly engaged in the business practice of acquiring used processors—also known as central processing units (CPUs)—to include in new computer servers it builds for Cisco, which Cisco sells to its customers, including the federal government. In particular, Jabil acquired used Intel Xeon processors, which are a type of

---

[1] *See* https://www.fastcompany.com/3045936/jabil-circuit.

processor used in enterprise servers and workstations. On information and belief, Jabil includes these used Intel Xeon processors in servers it builds for Cisco without disclosing their used quality, thereby concealing this critical fact from both Cisco and Cisco's ultimate customers.

4.  Jabil engages in this practice to boost its already substantial profits. Because Jabil negotiates fixed component pricing with Cisco ahead of its server builds, it earns cost savings when it subsequently purchases processors at a lower price than it negotiated with Cisco. Purchasing used processors rather than new ones is one way that Jabil can guarantee cost savings.

5.  Relator, the founder and CEO of one of Jabil's preferred vendors, learned of Jabil's practice through numerous interactions between himself or his employees and representatives of Jabil. Relator's company, Asian Atlantic Industries LLC ("AAI"), competes for Jabil's business with other vendors that source and provide access to all integrated circuits for Jabil, to include processors and Xeon processors, though Relator's company has refused to provide such used processors without appropriate disclosures and can no longer compete on price accordingly. In order to confirm that Jabil was purchasing used processors from other vendors, AAI solicited and received an express offer from Jabil's Cisco Business Unit to purchase used Intel Xeon processors through AAI, though Jabil insisted on omitting from the purchase order the fact that the processors were used. AAI then walked away from the deal.

6.  This complaint details how Jabil's regular engagement in this business practice has caused Cisco and/or its distributors to submit an unknown quantity of false claims for payment to agencies of the federal government purchasing Cisco's servers. Unbeknownst to Cisco, its distributors, or the federal customers, many of those servers include used Intel Xeon processors, rather than the new ones the government contracted, bargained, and paid for.

7.      The factual falsehood or omission would have been material to these agencies of the federal government because, among other reasons, the installation in federal government servers of used processors that originated in a foreign country poses a substantial information security risk. For this reason, the General Services Administration ("GSA") distinguishes new electronics from used under its Schedules Program, and it recently announced a policy of declining to purchase used and refurbished electronics equipment through this program—the precise vehicle through which federal agencies purchase many Cisco servers.

8.      As described below, Defendant Jabil has knowingly caused Cisco and/or its distributors to submit false claims for payment to federal agencies by its intentional omission of this material information.

## II.    JURISDICTION AND VENUE

9.      This action arises under the United States Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

10.     This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331. This court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. 3732(a) because that section authorizes nationwide service of process and Defendant has minimum contacts with the United States.

11.     Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendant operates and transacts business within this District and committed acts proscribed by 31 U.S.C. § 3729 in this District.

12.     To the best of Relator's knowledge, the facts and circumstances alleged in this Complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, nor in a congressional, Government

Accountability Office, or other Federal report, hearing, audit, or investigation, or to the news media.

13. Relator is an original source of the information upon which this complaint is based, as that term is defined in 31 U.S.C. § 3730(e)(4)(B).

**III. PARTIES**

14. The real party in interest is the United States of America.

15. Relator is a resident of Rye, New Hampshire. He is the Chief Executive Officer of AAI, which he founded in 1998 to meet the growing supply and demand for excess electronics components. AAI is headquartered in Portsmouth, New Hampshire.

16. AAI provides inventory management services to buyers and sellers in the electronics industry. Through its proprietary software and industry expertise, AAI tracks supply and demand of electronics components. It supports buyers by providing access to product availability and supports sellers by helping them move excess supply quickly and profitably.

17. Defendant Jabil is a large provider of manufacturing services across multiple industries, including information technology. Jabil is headquartered in St. Petersburg, Florida, but it does business globally. Jabil primarily serves clients through a series of dedicated business units that provide manufacturing design and production services to particular customers. Through one of these dedicated business units, Jabil regularly builds information technology servers for Cisco, which sells a substantial amount of its servers to agencies of the United States federal government.

18. Jabil and other subcontractors in the electronics industry routinely retain third party providers of inventory management services such as AAI to help acquire component inventory, including processors, in the quantities needed to ensure the completion of their server builds. Jabil has a dedicated Cisco Business Unit that purchases processors from inventory

4

management vendors for servers it builds for Cisco. AAI is one such vendor for Jabil, and it operates in the market to facilitate integrated circuit acquisitions for Jabil's Cisco and other business units.

## IV.  JABIL'S FALSE CLAIMS ACT VIOLATIONS

### A.  Cisco provides a substantial amount of information technology hardware to the federal government.

19.  Cisco is a multinational technology conglomerate headquartered in San Jose, California. Cisco develops, manufactures, and sells, among other items, computer-networking hardware.

20.  Cisco sells a considerable amount of its products, including its computer servers, to agencies of the federal government, perennially placing it among the largest federal contractors in the United States. In fiscal year 2018, Cisco earned $306,505,000 from sales pursuant to contracts with federal agencies, placing it as the 69th largest federal contractor in the United States by revenue.

21.  Cisco products are available to all agencies of the federal government pursuant to multiple large federal contracts. These include the Chief Information Officer – Commodities and Solutions contract ("CIO-CS") and the Solutions for Enterprise-Wide Procurement ("SEWP"), both of which are government-wide acquisition contracts facilitating the sale of information technology products and services to any federal civilian or defense agency. Cisco products are also available to all federal entities through the General Services Administration ("GSA") Schedules Program (also known as Multiple Award Schedules, the "MAS" program) through federal contracts with four large distributors: Tech Data; Promark; SYNNEX Westcon-Comstor; and EC America.

### B. Jabil provides extensive electronics design and manufacturing services to Cisco.

22. For fiscal year 2019, Jabil reported annual net revenues of $25.3 billion and net income of $287.1 million. Revenue has steadily increased from previous years: Jabil reported $22.1 billion in revenue for 2018 and $19.1 billion for 2017.

23. Jabil has repeatedly described itself as reliant on a small base of large customers, of which Cisco is one of the largest. Jabil regularly discloses similar language in its annual 10-K forms, reporting that it "depend[s], and expect[s] to continue to depend, upon a relatively small number of customers for a significant percentage of our net revenue, which in turn depends upon their growth, viability and financial stability."

24. Jabil's 2019 10-K disclosed its largest customers "based on net revenue," for instance, listing Cisco third behind only Apple and Amazon. Its 2017 and 2018 10-Ks listed Cisco second behind only Apple. Jabil most recently disclosed its numeric revenue from Cisco in its 2004 10-K, when Cisco accounted for 12 percent of Jabil's net revenue.

### C. Jabil builds information technology servers for Cisco, which Cisco in turn sells to the federal government.

25. Jabil regularly builds servers for Cisco, including on information and belief Cisco's widely used Unified Computing System blade servers. One of the essential component parts in all servers, including Cisco's Unified Computing System blade servers, is the processor.

26. Approximately twenty years ago, Jabil and other subcontractors in this space implemented an "Approved Vendor" qualification process, part of which included what Jabil called the "Purchase Price Variance" program ("PPV").

27. Pursuant to the PPV, when Jabil contracts to build a server for its customers, such as Cisco, it fixes the pricing for components such as processors in advance of developing the server build. Jabil then purchases those components through its approved vendors, such as AAI.

6

Critically, when negotiating its purchase price for these processors through its vendors, Jabil attempts to earn cost savings by purchasing the processors at a lower price than the price it pre-negotiated with its customer. At base, Jabil's PPV approach incentivized the company—even more than usual—to source components such as processors as cheaply as it possibly could.

28.     In or around 2002, AAI was introduced to Jabil through two AAI employees, Greg Lewis and Ray Liston, and AAI was approved as a vendor for Jabil. In approximately 2008, AAI fired Liston and Lewis for several issues of workplace misconduct. AAI later discovered through review of its internal emails that Liston and Lewis purposefully accepted orders which Liston and Lewis knew AAI had no ability to fill. AAI was suspended from Jabil's vendor list due to these actions by Liston and Lewis.

29.     Relator learned through conversations with a representative of Converge, another vendor and the employer of Lewis and Liston prior to AAI, that Lewis and Liston had engaged in similar actions at Converge, also resulting in Converge's suspension from the vendor list.

30.     Lewis and Liston subsequently entered employment at another vendor, Classic Components. On information and belief, Lewis and Liston then contrived with Tom Peters, an employee at Jabil who knew at the time he was soon to be terminated, to have Jabil approve Classic Components as a vendor. On information and belief, Peters agreed with Lewis and Liston to arrange for Jabil approval of Classic Components in exchange for help obtaining a job at Classic Components after his departure from Jabil.

31.     On information and belief, Liston and Lewis acted intentionally to cause the suspension of AAI from Jabil's vendor list for the benefit of Classic Components. Classic Components was also ultimately suspended from Jabil's vendor list for similar reasons to AAI

and Converge, demonstrating a pattern of similar self-interested actions by Liston and Lewis to harm their current employer for the benefit of their next venture.

32. In 2014, having acted to cause the suspension of three competitors from Jabil's approved vendor list, Lewis and Liston left Classic Components to start their own vendor company, Cube Components.

> **D. Jabil has purchased used processors without disclosing this to Cisco or its distributors, which submitted claims for payment to the federal government for servers without disclosing their used quality.**

33. Cube Components was immediately added by Jabil to its approved vendor list, apparently through an expedited or streamlined vendor qualification process relative to that required of AAI and others. Cube Components provided Jabil with access to Intel Xeon processors at a significant discount, in some cases as large as twenty percent, from what AAI was able to provide profitably.

34. Through multiple conversations between representatives of AAI and representatives of Jabil, Relator learned that Cube Components was primarily sourcing to Jabil Intel Xeon "Grade A Pulls," which are used processors. The term "pulls" is a reference to the fact that these used processors are "pulled" from another server. By selling these "pulls," Cube Components was able to obtain a significantly lower price for Jabil than Cube's competitors, which were sourcing new Intel Xeon processors.

35. Relator has since discussed Jabil's acquisition of used Intel Xeon processors with Dennis O'Reilly, the head of Jabil's PPV program. In separate conversations, when presented with information that Jabil was likely acquiring used, rather than new, processors, O'Reilly informed both Relator and AAI's former relationship manager for Jabil, Charlie Seefried, that it did not matter to him, provided the vendor represented the product was good quality.

36. During these conversations, Seefried also asked O'Reilly how Cube Components was approved by Jabil so quickly, despite lacking many of the typical requirements for approved vendors, including warehousing, proper testing procedures, prior business history, and financial stability. Jabil typically performs an in-person examination of prospective vendors to verify these requirements. O'Reilly informed Seefried that Cube, through Liston and Lewis, had access to a "unique channel of supply" that other vendors could not match.

37. After Seefried resigned from AAI due to his inability to compete with Cube Components for Jabil business, numerous similar conversations occurred between Relator and O'Reilly during which Relator informed O'Reilly of the likely used processors, and O'Reilly reiterated his comment that he only cared about quality. O'Reilly made the same comment during similar conversations with Mike Gately of Converge and Jim Wilson of Marathon Tech.

38. However, Relator also learned from O'Reilly that when negotiating component pricing for its server builds, Jabil did not note on its purchase orders that it acquired used, not new, processors.

39. Soon after learning that Cube Components was helping Jabil to acquire used Intel Xeon processors, AAI attempted to gain share in this business. AAI has quoted multiple offers to Jabil to purchase similar grade A pull processors, but AAI dropped the offers upon learning from Jabil that it refused to note on the purchase order the used quality of the processors.

40. Approximately three years ago, Jay Neto, a representative of AAI, spoke in person with Jorge Zepeda, at the time an employee in Jabil's Cisco Business Unit but now a former employee working at a different company. During this conversation, Zepeda admitted to Neto that Jabil was acquiring used Intel Xeon processors and passing them off as new.

41.     Referring to Jabil's acquisition of Grade A pulls, Zepeda described Jabil's project as "acquiring used products as if they were new." Zepeda said he issued the purchase orders at the direction of another Jabil employee, Diego Mendoza.

42.     Neto asked Zepeda whether Jabil ensured the quality of the used Intel Xeon processors, and Zepeda said they would test "a few pieces" and "allowed the others to go through" if the quality of those first few was acceptable.

43.     Zepeda told Neto that he did not wish to "get his hands dirty" by the "bad things that were happening" at Jabil, and he has since left the company, partly for this reason.

44.     Approximately two years ago, Jabil's Cisco Business Unit hired two employees to handle its supply chain: Gabriel Cisneros Rodriguez, Supply Chain Product Manager, and Alberto Bertoldi, Supply Chain Development Manager. In multiple conversations with representatives of AAI over the past two years, both have admitted that they had been acquiring used Intel Xeon processors and planned to continue doing so. They invited AAI to share in this business but were not willing to disclose the used quality of the processors on the Jabil purchase order to AAI. AAI declined for this reason. On information and belief, Cisneros Rodriguez and Bertoldi handle all of Jabil's supply chain for its Cisco server builds.

45.     Approximately one year ago, Relator spoke with Jim Wilson, an industry representative with longstanding relationships at Jabil, including with O'Reilly, about possibly joining AAI, in part to help AAI gain market share within Jabil. As part of this consideration, Wilson contacted O'Reilly and discussed AAI's contacts with one of Cube's used processors suppliers (E-Energy, based in Shenzhen, China) and AAI's ability to provide similar access to this supply. These conversations occurred in part because AAI heard Cube had been suspended as a Jabil vendor for quality concerns, though AAI later learned that Cube was never suspended.

When AAI inquired as to Cube's suspension and potential for AAI to step in and fill the void during Cube's suspension, O'Reilly replied that AAI did not have sufficient "connections" to continue this business and asked Wilson to "drop it."

46. Relator subsequently discussed the matter again with O'Reilly, explaining that AAI knew the supplier in China and would like to provide access to this business. O'Reilly declined and told Relator to "leave this business alone."

47. In a separate May 2020 interaction, Neto contacted Cisneros Rodriguez by email regarding an opportunity to purchase grade A pull processors through AAI. After Cisneros Rodriguez had agreed to move forward with the order, Neto informed Cisneros Rodriguez that AAI would be able to source the used processors, but insisted that the purchase order accurately reflect the fact that the processors were used. Cisneros Rodriguez replied in writing, "We are not going to be able to add this data into the PO," at which time Neto walked away from the proposed deal.

48. Recently a second company, Smith & Associates, has also begun to arrange the sale of used processors to Jabil from the same vendor as Cube Components. On information and belief, Cube Components and Smith & Associates combine to source approximately $60 million in processor sales to Jabil annually.

49. On information and belief, Jabil has purchased an unknown, large quantity of used Intel Xeon processors through Cube Components, Smith & Associates, and potentially other vendors as a part of a common business practice in its Cisco Business Unit.

50. On information and belief, Jabil knowingly has incorporated the used Intel Xeon processors into servers it built for Cisco, including the Unified Computing System blade servers, without disclosing that the processors were used.

51. On information and belief, Cisco has sold an unknown, large quantity of servers with undisclosed used processors to agencies of the federal government, including through its distributors selling under GSA Multiple Award Schedule 70. In doing so, Jabil caused Cisco and/or its distributors to submit claims for payment to these agencies that were false by their omission of the used quality of the Intel Xeon processors.

    **E.**    **Cisco sells its servers to the federal government under a GSA schedule expressly designated for *new* electronic equipment, and the GSA has recently announced a policy of declining to purchase used electronic equipment.**

52. Each of Cisco's four distributors sells Cisco's products, including its servers, to agencies of the federal government through GSA Multiple Award Schedule 70 for Information Technology, and each publishes contractor-specific terms and conditions that govern sales under this Schedule by that distributor. For each distributor, these terms and conditions expressly note that Cisco's electronic equipment is available under GSA Special Item Number ("SIN") 33411 / 132-8, the designation reserved for "Purchasing of new electronic equipment," including "servers." Therefore, each of these distributors sells Cisco servers under a designation that expressly represents those servers as new.

53. For each distributor, these terms and conditions do not make any of Cisco's products available under the separate GSA SIN reserved for "Purchase of Used or Refurbished Equipment" (33411REF / 132-9).

54. Moreover, for each of these four distributors, the terms and conditions expressly incorporate the contractor's standard warranty in sales under GSA SIN 33411. For instance, the Tech Data terms and conditions for purchase under SIN 33411 warrant that, "Unless specified otherwise in this contract, the Contractor's standard commercial warranty as stated in the contract's commercial pricelist will apply to this contract."

55. Cisco's standard commercial warranty for hardware (its "Limited Hardware Warranty," available publicly on Cisco's website) warrants that, "Cisco replacement parts used in Hardware replacement may be new or equivalent to new." This warranty permits Cisco to use "equivalent to new" component parts only in case of "Hardware replacement," and in doing so it represents that the original hardware product, purchased new, will include only new component parts, not "equivalent to new."

56. Agencies of the federal government have a material interest in the provenance and quality of the component processors in their servers because used processors of unknown provenance pose risks of supply chain disruption and information security breaches.

57. GSA reflects this material interest by its clear demarcation of used electronics equipment from new equipment in the use of these SINs and their definition under the GSA Schedule, demonstrating the materiality to federal agencies of Jabil's omission to Cisco, a federal contractor.

58. Further reflecting this material interest, GSA has recently implemented a policy of declining to purchase used and refurbished electronics equipment. Effective October 1, 2020, GSA will retire its use of SIN 33411REF for "Purchase of Used or Refurbished Equipment" in the GSA Schedules Program. After this date, purchase of used or refurbished equipment will not be available for award under a new offer or add-SIN modification as part of the Schedules Program.

59. As its rationale for the retirement, GSA has cited "increasing interest in compliance implementation of supply chain risk controls in government contracts." Related factors included, "support[ing] the ongoing federal IT Modernization initiative" and that "supply

chain vulnerabilities are mitigated by removing the products offered under SIN 132-9/33411REF."

60. These supply chain vulnerabilities include the information security risks posed by used and refurbished products. GSA cited an April 2020 memo by the Trump Administration emphasizing the policy of the United States to combat trafficking in counterfeit and pirated goods, as well as the May 2020 Executive Order on "Securing the Information and Communications Technology and Services Supply Chain." GSA noted that these policies aim to limit the risk that US infrastructure can be compromised by people working for a foreign adversary and to limit the risk of adversaries interfering with supply chains to sabotage electronics or use them to spy.

61. Cube Components and Smith & Associates obtain access to their supply of used processors through at least one supplier based in China, E-Energy, located in Shenzhen. Relator learned this through a representative of AAI, who contacted E-Energy about acquiring processors and was provided with a list of reference companies who were buying used processors from E-Energy. The list included Cube Components and Smith & Associates, and the parts offered were consistent with those used in production for Jabil's Cisco builds.

62. Cisco's use of SIN 33411 for new electronics equipment, and GSA's retirement of SIN 33411REF for used electronics, demonstrate that the used quality of the processors purchased by Jabil from China would have been material to decisions by federal agencies to purchase Cisco servers.

**COUNT I: VIOLATION OF FALSE CLAIMS ACT 31 U.S.C. § 3729**

63. Relator incorporates paragraphs 1 through 62 of this complaint as though fully set forth herein.

64. This count sets forth claims for treble damages, penalties, and other damages as provided for under the False Claims Act, 31 U.S.C. §§ 3729-3732.

65. Jabil has adopted a common business practice of acquiring used processors and including them without disclosure in server builds for its Cisco business, one of its largest customers and sources of revenue. Cisco is one of the country's largest federal contractors and sells large volumes of its servers to agencies of the United States government. For each server purchased by a federal agency from Cisco that includes used processors, Jabil has caused Cisco to submit a claim for payment to the agency that is false by its omission of the fact that the server was constructed with used processors. This omission would have been material to the federal agencies' decision to purchase the Cisco servers, as evidenced by the GSA's use of SINs to distinguish new servers from used and its announced policy that under its Schedules Program, the GSA will no longer purchase used and refurbished electronics equipment.

66. By engaging in this conduct, Defendant Jabil knowingly violated:

   a. 31 U.S.C. § 3729(a)(1)(A) by causing to be presented false or fraudulent claims for payment of approval; and

   b. 31 U.S.C. § 3729(a)(1)(B) by making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

67. Because of the false or fraudulent claims made by Defendant, the United States has suffered and continues to suffer damages and is therefore entitled to recovery as provided by the False Claims Act of three times the amount of damages sustained by the Unites States, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

Wherefore, Relator Thomas Mahoney respectfully prays for judgment against Defendant Jabil, Inc. as follows:

A. That the Court enter judgment against Defendant and order that it cease and desist from violating 31. U.S.C. §§ 3729, et seq., immediately;

B. That the Court enter judgment against Defendant in an amount equal to three times the amount of damages that the United States has sustained because of Defendant's actions, plus a civil penalty for each claim submitted in violation of 31 U.S.C. § 3729;

C. That the Court enter judgment against Defendant for the costs of this action, with interest, including costs to the United States for its expenses related to this action;

D. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. 3730(d);

E. That the United States and Relator receive all relief, both at law and in equity, to which they may be reasonably entitled; and

F. That the Court order any other relief which it deems to be appropriate and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Thomas Mahoney demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Charles Wm. McIntyre*

Charles Wm. McIntyre, Esq. (D.C. Bar No. 489302)
MCGUIREWOODS LLP
2001 K Street N.W.
Suite 400
Washington, D.C. 20006-1040
Ph: 202-857-1742
cmcintyre@mcguirewoods.com

Jeremy S. Byrum, Esq. (VA Bar No. 70864)
(*Application forthcoming for D.D.C.*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Ph: 804-775-4305
jbyrum@mcguirewoods.com

Nicholas J. Giles, Esq. (D.C. Bar No. 1024886)
(*Application forthcoming for D.D.C.*)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Ph: 804-775-4760
ngiles@mcguirewoods.com

Bryan M. Weynand, Esq. (D.C. Bar No. 1033908)
(*Application forthcoming for D.D.C.*)
MCGUIREWOODS LLP
201 North Tyron Street
Suite 3000
Charlotte, NC 28202-2146
Ph: 704-343-2210
bweynand@mcguirewoods.com

**Counsel for Relator, Thomas Mahoney**